## J. D. SERGEANT ET AL. v. CHARLES MARTIN.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
NO. 3 OF PHILADELPHIA COUNTY.

Argued January 20, 1890—Decided March 31, 1890.
[To be reported.]

(*a*) Ruhl, a conveyancer, applied on behalf of Martin to Sergeant for a loan upon a mortgage. The money was to be used in satisfying a prior mortgage. Sergeant agreed to make the loan, and afterwards gave Ruhl a check for the money. Sixteen days after that, Martin executed the mortgage and gave it to Ruhl, who placed it on record. Ruhl embezzled the money paid him by Sergeant:

1. In an action on the mortgage, each of the parties having denied that Ruhl was his agent to handle the money, and the testimony tending to prove that Sergeant paid it to Ruhl on the faith of his supposed integrity and financial responsibility, without any inquiry as to whether he was authorized by Martin to receive it or not, a refusal by the court to give binding instructions for the plaintiff was proper.*

2. If, after stating certain things as facts, in the charge to the jury, the court, upon exception being taken to these statements before the retirement of the jury, at once address them again, withdrawing the statements excepted to and instructing that there is no evidence to sustain them, the Supreme Court will not reverse upon the ground that the original statements were unsupported.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, MC-COLLUM and MITCHELL, JJ.

No. 28 July Term 1889, Sup. Ct.; court below, No. 210 June Term 1888, C. P. No. 3.

On May 21, 1888, J. Dickinson Sergeant and Henry S. Low-

---

*Note the distinction between the facts in Pepper v. Cairns, ante, page 114, and those of this case. In the former, Ruhl brought to Sergeant the mortgage which Cairns had executed and placed in his hands for delivery, and Sergeant paid him the money upon receiving the mortgage from him. His possession of the mortgage for the purpose of delivery justified Sergeant in assuming that he was authorized to receive the money upon it when he delivered it. In Sergeant v. Martin, however, the money was paid to Ruhl, not only before delivery of the mortgage, but actually prior to its execution, and at the time of receiving Sergeant's check Ruhl had no indicia of authority to represent Martin in so doing.

ber, trustees under the will of Thomas Sergeant, deceased, brought scire facias against Charles Martin upon a mortgage for $2,500, dated February 7, 1887, executed by the defendant to the plaintiffs. The defendant pleaded payment, with leave, etc.

At the trial on February 14, 1889, the following facts were shown: The defendant, Charles Martin, was the owner in 1886 of two adjoining houses and lots of ground in Philadelphia, which were together subject to a mortgage for $5,375 in favor of the estate of Charles O. Baird. In December, 1886, Martin made a contract to sell one of the lots to John R. Levering, and applied to John Ruhl, a conveyancer, who had transacted business for him previously, to have the necessary conveyance from himself to Levering prepared. Desiring to give Levering a title that would not be subject to the whole of the Baird mortgage, he consulted Ruhl, also, concerning a proposed application to the representatives of the Baird estate for its apportionment between the two lots. Ruhl advised him that as there were minors interested in that estate it would be expensive to obtain an apportionment, and suggested the plan of borrowing on separate mortgages of the lots a sufficient sum to pay off the Baird mortgage. This plan having been determined on, it was arranged that Levering would execute a mortgage for $2,800 upon the house and lot sold to him, and Martin would execute one for $2,500 upon the other house and lot. On December 29, 1886, Ruhl wrote to J. D. Sergeant, one of the plaintiffs, who was trustee of several estates, including the estate of Thomas Sergeant and the Sepviva estate, as follows:

"My Dear Mr. Sergeant: The loans below are gilt edged, A. No. 1; first, $2,800 at 5 per cent flat upon 1840 Park Avenue, 22×105; three-story brick store and dwelling house; assessed at $6,800, and recently sold for $9.500. Second, $2,500 same rate upon 1844 Park Avenue, 33×105; three-story brick dwelling; assessed at $8,500. The mortgages are of course first incumbrance."

Sergeant indorsed upon the letter the following reply to the application:

"One mortgage $2,500 to J. D. S. & H. S. L., trustees under the will of Thomas Sergeant, deceased; other Sepviva."

On January 22, 1887, Sergeant gave to Ruhl his checks for

the amounts of the loans, payable to Ruhl's order.   On February 7, 1887, the mortgages of that date were executed, and were left by the mortgagors with Ruhl, who had them recorded.

The defendant being sworn as a witness on his own behalf, his counsel made the following offers :

Q. Did you ever at any time get, in any shape, manner or form, any consideration for this bond and mortgage ?

Objected to by plaintiffs' counsel.

By the court: Objection overruled ; exception.[7]   .

A. No, sir.   I did not see Sergeant or Lowber at any time. I did not get any money at any time from Sergeant or Lowber, or from any one else on this mortgage.

Q. I hand you check for $2,500, did you ever receive this check ?

Objected to by plaintiffs' counsel.

By the court: Objection overruled ; exception.[8]

A. No, sir.

Q. When first did you know that this check was given ?
A. When John Ruhl failed.

Being cross examined, the witness testified: Off and on I have had dealings with John Ruhl.   I did- not have many dealings with him.   I bought ground from the Sepviva estate.. I recognized Ruhl as agent for the Sepviva estate.   I have had about four transactions with Ruhl.   The first time I had dealings with John Ruhl was about four years ago, about a ground rent on Otis street; then this property on Park avenue.   I authorized him to offer $13,000 for it; afterwards they accepted my offer.   He drew the deed to this property for me and he bought this property for me.   I had four transactions with him . as conveyancer.   He did not keep my deed.   He did collect moneys for me and make payments for me.   He collected a small mortgage for me.   He did not collect money for me from E. B. Williams, or E. Kruger.   In the Otis street matter, he drew my papers and recorded them.   He only had a regular account against me for costs and charges.   He did prepare leases and mortgages for me and recorded papers for me.   In the Otis street matter, I didn't receive a bill from Ruhl for services, but I received a bill from Joseph M. Pile.   He (Ruhl) prepared mortgages for me from building associations.   He had something to do with all my properties, because he looked

after the interests of the building associations. He acted for me in four matters. I had no other conveyancer during the time I have referred to. He drew the deed to Levering and the deed to me. The Baird mortgage was $5,375. I expected that the parties who were getting these two mortgages would see that the other mortgage due the Baird estate would be satisfied.

Q. How did you propose to pay a mortgage amounting to $5,375 with $5,300. A. I was to pay the $75 when Mr. Ruhl settled his account with me. He was to settle the Otis street account with me, then I was to pay the $75. I did not make application to Mr. Sargeant in this matter. In December, 1886, I got this loan. Mr. Ruhl made the application to Mr. Sergeant and did so in every instance.

On re-direct examination he testified further: Ruhl had two offices, one up town, and one over here on Walnut street.

Q. Did you on any occasion ever pay any interest to Mr. Sergeant? A. I paid Ruhl interest for the Sepviva estate. . . . . The $5,375 due the Baird estate for mortgage was never paid. I know it was not paid, because I have had bills sent to me for the interest, and I paid the interest.

Re-cross-examined: I executed this mortgage at my house. The mortgage was then taken away by a messenger sent by Ruhl. I executed the mortgage and left it with Ruhl, because I thought he represented the estate. It was never signed before a notary. I could not tell whether I ever had dealings with the Sergeant estate. I had an extinguishment of four ground rents some time ago, but I never knew to whose estate. I always thought the thing was all one; that was the way I mixed it up.

The defendant having rested, the plaintiffs in rebuttal called J. Dickinson Sergeant, who testified as follows: I am one of the plaintiffs and one of the trustees of the Sergeant estate. Henry S. Lowber is the other trustee. I acted alone in this matter. (Witness shown letter, December 29, 1886.) I recollect that letter. I agreed to take a $2,500 mortgage for the Sergeant estate. I never knew of the $5,375 mortgage. I never authorized John Ruhl to pay off this mortgage for me. John Ruhl was never employed by me as the trustee of the Sergeant estate. I gave him a check for $2,500. Ruhl would

### Statement of Facts.

come in or send me word that the papers were ready and that he wanted the money, and I would send him my check. I do not know who prepared the papers. I do not know who paid Ruhl for preparing the papers. I never paid him anything. I never paid Ruhl for any services in connection with this estate. I treated with him as a conveyancer and as I would with any other reputable conveyancer.

Cross-examined: When I take a mortgage I never do pay the conveyancer for the papers; conveyancer is paid by the other side. In this matter no one acted for me as conveyancer. I looked at the papers myself afterwards. In this instance, I depended on the conveyancer who brought the security to me. I thought he was acting for the other man. If the mortgage had not been a first mortgage, I would have held Ruhl responsible. Ruhl was not my conveyancer, but Martin's.

If a conveyancer comes to me and says a matter is all right I give him a check. I have no conveyancer. I supposed that Ruhl was an honest, capable conveyancer. I did trust to the other party's conveyancer. I have done it with all the conveyancers in town. I have done it with other parties than Ruhl. I don't recollect any one else except Mr. Pile that I have done it with, but I would do it with any reputable conveyancer. Mr. Pile has been my attorney for some years, and is also a conveyancer. I cannot recollect where I gave a check to a representative of a mortgagor. I do not recollect the name of the person with whom I so dealt. I do not recollect looking at this particular mortgage before Ruhl went away. Mr. Ruhl stated the place worth the loan.

I did not investigate the matter. I don't think I have a brief of title; if I have, it is with the papers. The office of the Sepviva estate is 512 Walnut street. Mr. Emlen is the agent for the Sepviva estate. Mr. Ruhl collected rents for Mr. Emlen, and not for me. Mr. Ruhl received one third of five dollars from the Sepviva estate for car fare; Mr. Emlen paid the other two thirds. Mr. Ruhl received one third from the Sepviva estate merely for car fare. He received no other money from the estate. He did not work for the estate, he worked for Emlen. I heard of the first mortgage after Ruhl's failure.

Q. Before the mortgage was made out you gave a check to

Charge of Court below.

Mr. Ruhl. When did you first see the mortgage after that, that you remember? A. I gave this check January 22, 1887. I cannot recollect, but I presume I received a note from Ruhl saying the mortgage was correct. I heard of the Baird mortgage after the trouble with Ruhl in December, 1887. All I knew or can recollect is, that before I got the mortgage I gave the check to Ruhl, and did not know any more about it until Ruhl ran away.

Re-examined: When I would get a mortgage or other security, I would put it with the papers of the estate. After Ruhl's failure I found this $2,500 mortgage with the other papers of the estate at my office. The Sepviva estate has no connection with the Sergeant estate.

At the close of the testimony, the court, FINLETTER, P. J., charged the jury as follows:

It appears from the evidence that Ruhl was employed to prepare a deed for property owned by Mr. Martin, which Mr. Martin had sold and desired to have conveyed to his brother-in-law, Mr. Levering. Out of that transaction there arose two mortgages; one executed by Mr. Martin, and the other executed by Mr. Levering; one for the sum of $2,500, and another for $2,800; and it appears from the evidence in some way that the proceeds of those mortgages were to pay off a prior mortgage which was upon the whole lot, a portion of which was conveyed to Mr. Levering. That mortgage had been given, as the testimony shows, to Mr. Baird, or to parties interested in his estate.

Now, before either of these mortgages, the mortgage for $2,800 or $2,500 was executed, Mr. Ruhl wrote to Mr. Sergeant that he had these mortgages, and that they were first-class mortgages. You have heard the correspondence read, how, and what was said, before this occurred; before the mortgages were executed, before they were prepared. Upon the receipt of this letter, [Mr. Sergeant wrote to Mr. Ruhl to see that the title was good, and that everything connected with the mortgages was right, was in proper order and condition.] [2] And, either at that time or shortly afterwards, certainly before the mortgages were executed, he sent the money in a check drawn to Mr. Ruhl's order. Mr. Ruhl subsequently received

the mortgage from Mr. Martin and put it on record. And Mr. Sergeant had no knowledge of this mortgage until after Mr. Ruhl had run away with the $2,500, he not having paid it for Mr. Martin or used it on his account.

Now, it is very important that you should consider the relations in which Ruhl and the plaintiffs and the defendant stood toward each other. Because, from the consideration of these relations, and from the evidence in this case, and from the evidence disclosing briefly the relations in which the parties stood to each other, you will perhaps determine the question of agency, which is an important question in this case.

[Now, Mr. Ruhl, it appears, had an office with Mr. Sergeant. He had many transactions in which Mr. Sergeant was interested, and that business relation, having an office with Mr. Sergeant and conducting business for him as agent or trustee for several estates.][3] Perhaps these transactions covered several years. Undoubtedly, it appears from even Mr. Sergeant's testimony that Mr. Ruhl was trusted, perhaps as no other man has been trusted, in the general business which Ruhl himself had with Sergeant or with those interests in which Sergeant was intimate. [In this particular transaction, this particular mortgage, certainly Ruhl was written to by Sergeant to see that everything was right, and as I said, before he paid the money.][4] . . . . .

I call your attention to the testimony of Mr. Sergeant, who says he never trusted a conveyancer except Mr. Pile. He subsequently said that he trusted Mr. Ruhl, just as he had trusted Mr. Pile in transactions of this character. He furthermore says, he dealt with Mr. Ruhl in this matter, that is, in the matter of ascertaining whether the mortgage was good, and he says, in addition to that, gentlemen, that he would have held Mr. Ruhl responsible for any error or mistake or loss on that transaction. Now, gentlemen, on the other hand, it appears that Mr. Ruhl had to a certain extent gained the confidence of the defendant in this case; he had, further, four distinct and several transactions covering a period of three or four years; that, in addition to his own transaction, he dealt with Mr. Ruhl, or Mr. Ruhl conducted the affairs of a building association, in which Mr. Martin had some concern. [And in addition to that, he tells you that he repeatedly saw Mr. Ruhl at

Charge of Court below.

Mr. Sergeant's office upon these transactions. And transactions grew out of them.] [5] In addition to that, there is evidence to show that in relation to this very transaction, this mortgage and the money connected with it, he had correspondence with Ruhl. The importance of that is entirely a matter for you. But all of these things are to be considered in determining, as I said before, the principal question in this case, for whom was Ruhl agent? Was Ruhl acting for Sergeant? If he was acting for Sergeant, and did not pay the money to Martin, the plaintiffs cannot recover. The plaintiffs cannot recover, unless in receiving the money Ruhl was authorized to receive it as Martin's agent.

It is not necessary, gentlemen, that any specific writing shall be prepared making a man an agent for another. Nor, indeed, is it necessary that any specific verbal communications shall be made. An agency may be inferred from the acts of the party. If you permit a man to transact business for you, one has the right to infer he is in that business, you knowing that he is transacting it in your name. So, in this transaction, you are to determine from the evidence who Ruhl was acting for at the time he received the money. In this particular case, the evidence shows that Mr. Sergeant paid over the money to Ruhl, or sent him his check, a considerable time before any examination of title or searches or the mortgage was drafted or executed; and therefore he could not be said to have paid the money because Mr. Martin had put the executed mortgage in the hands of Ruhl, and by that act authorized him to receive the money. The money was paid and [instructions given to Ruhl to examine the title.] [6]

I have been requested to charge that, under the evidence, the verdict should be for the plaintiffs. I decline so to charge.[1]

—Upon the conclusion of the charge, exception was taken by the counsel for plaintiffs to the portions in [　], whereupon the learned judge again addressed the jury and said:

Gentlemen, I have said that, upon receipt of a letter, Mr. Sergeant wrote to Ruhl to see that the title was good; I also said that Mr. Ruhl had an office with Mr. Sergeant; and I said that Martin repeatedly saw Mr. Ruhl at Mr. Sergeant's office, and about other transactions connected with the Sepviva

estate.    I withdraw what I said upon those points, as there was no evidence to that effect.

The jury returned a verdict for the defendant.    Judgment having been entered thereon, the plaintiffs took this appeal, assigning for error :

1. The answer to plaintiffs' point.[1]

2–6. The parts of the charge embraced in [   ] [2 to 6]

7, 8. The admission of defendant's offers.[7] [8]

*Mr. Joseph M. Pile* (with him *Mr. S. E. Megargee*), for the appellants :

1. It was part of Ruhl's employment by Martin to get the money on this mortgage, and this he had done.    He got it to pay off the Baird mortgage for Martin, and that is what he failed to do.    Martin could not have received the money, because Ruhl was to apply it on the Baird mortgage, and not to pay it to Martin.    Everything in the matter was done by Ruhl for Martin.    He had been Martin's conveyancer for several years, and there was a running account between them.    Unquestionably he was Martin's agent in this instance, and Martin is responsible for his misfeasance in the course of his employment: Bank of Ky. v. Bank, 1 Pars. 248.    Even if Ruhl were held the agent of both parties, the burden of the fraud in embezzling the money must be placed where the fraudulent agent placed it : Wright's App., 99 Pa. 431.

2. As Martin, by his misplaced confidence in the agent whom he employed to get the money, and with whom he left the mortgage after execution, was the cause of the loss which one of two innocent parties must suffer, he cannot throw it upon the other party: Penna. R. Co.'s App., 86 Pa. 80.    The fact that Sergeant paid Ruhl the money before he secured the mortgage, will not avail Martin as a defence, inasmuch as he executed the mortgage and left it with Ruhl for the purpose of obtaining the money on it and having it recorded.    Having done so, he cannot set up a claim that Sergeant was negligent: Penna. R. Co.'s App., supra.    The fraud commenced after the completion of the mortgage and the payment of the money. Having trusted to Ruhl to apply the money for him, and having put it into his power to inflict the loss, Martin must bear

it: Morris v. Barnard, 15 W. N. 79; West v. Jones, 1 Sim., N. S., 208; Adsetts v. Hires, 33 Beav. 52; Green v. Rick, 121 Pa. 130.

3. The statements in the portions of the charge excepted to were too sweeping to be considered as mere slips of the tongue, and the withdrawal of them was too feeble to dissipate their effect. It was like breaking off a sword and leaving the point in the wound. In Coxe v. Deringer, 82 Pa. 236, and Linn v. Commonwealth, 96 Pa. 285, this court condemned the use of unfair language by the trial judge. Moreover the questions covered by the seventh and eighth assignments of error should not have been allowed. The first was improper, because the defendant had shown by his own testimony that Ruhl was his agent to get the money and pay off another mortgage with it. Whether the witness received the money was therefore immaterial, and whether he got any consideration for the mortgage was a question of law, and not of fact. The other question was totally irrelevant; it is not pretended that Martin expected to receive the check.

*Mr. John G. Johnson*, for the appellee:

1. The plaintiffs were not entitled to a binding charge in their favor, but such a charge should have been delivered in favor of the defendant. Martin believed that Ruhl was Sergeant's agent, and in that belief applied to him for a loan. Whether he was right or wrong, such was his belief. He executed the mortgage expecting that the mortgagee would pay off the first mortgage. Sergeant never saw the $2,500 mortgage until after Ruhl's flight; had no brief of title; caused no investigation to be made; and looked to Ruhl, whom he held responsible, that all should be right. In such circumstances, the loss should fall upon the plaintiffs.

2. It is incredible that any trustee would have trusted Ruhl and would have given him the money in advance of the receipt of the mortgage, if he had believed him to be acting for Martin; and as soon as it appeared that Sergeant had not paid the check to Ruhl upon the faith of the Martin mortgage, there was an end to the plaintiffs' right to recover. They had been misled by no authority in Ruhl, real or apparent. Moreover, it was the defendant, and not the plaintiffs, who was injured

by the course of the trial. By the statement of certain facts in the charge, and their subsequent withdrawal, the benefit of the charge was partially lost to us. We thought the statements of the trial judge were substantially right upon the facts.

OPINION, MR. JUSTICE STERRETT :

The learned president of the Common Pleas rightly refused to charge " that under the evidence the verdict must be for the plaintiffs." Indeed, he could not have done otherwise without ignoring the manifest bearing of their own evidence, and all the circumstances of the transaction. The defendant never received a cent of the $2,500 loan, which the mortgage in suit was intended to secure. It was paid to John Ruhl, by check of one of the plaintiffs, to his order, before they ever saw the mortgage ; in fact, it was so paid sixteen days before the mortgage was even executed, and without the slightest evidence that Mr. Ruhl was authorized to receive it, and, so far as the evidence shows, without any inquiry on that subject.

Mr. Sergeant, one of the plaintiffs, after testifying, inter alia, that he treated with John Ruhl as a conveyancer, and as he would any other reputable conveyancer, said : " In this matter, no one acted for me as conveyancer. I looked at the papers myself afterwards. In this instance, I depended on the conveyancer who brought the security to me. I thought he was acting for the other man. If the mortgage had not been a first mortgage, I would have held Ruhl responsible. Ruhl was not my conveyancer, but Martin's. If a conveyancer comes to me, and says a matter is all right, I give him a check. I have no conveyancer. I supposed that Ruhl was an honest and capable conveyancer. . . . . I did not investigate the matter. I don't think I have a brief of title ; if I have, it is with the papers. . . . . . I gave this check January 22, 1887. I cannot recollect but I presume I received a note from Ruhl saying the mortgage was correct. . . . . All I know or recollect is, that before I got the mortgage I gave the check to Ruhl, and didn't know anything more about it until Ruhl ran away." The same witness had previously testified in regard to his mode of doing business with Mr. Ruhl, indicating the confidence he had in his personal integrity, etc.: " Ruhl would come in or send me

word that papers were ready, and that he wanted the money, and I would send him my check."

In view of the testimony above quoted, and other evidence tending to show that the money was paid directly to Mr. Ruhl, at his request, on the faith of his supposed personal integrity and financial responsibility, and not because he was the agent or supposed agent of the defendant authorized to receive the same, the learned president of the Common Pleas was clearly right in refusing to charge, as requested, " that under the evidence the verdict must be for the plaintiffs." Indeed, he went to the very verge of propriety, in their favor, by submitting the case to the jury on the question of fact, whether, in receiving the money, Ruhl was authorized to act as Martin's agent. The jury, however, rightly settled that question by finding, in accordance with the decided weight of plaintiffs' own testimony, that Ruhl had no such authority.

The subjects of complaint in the second to sixth specificacations, inclusive, are certain portions of the charge, recited therein, respectively. Upon the conclusion of the general charge, each of these excerpts was excepted to, and thereupon the learned judge, addressing the jury, said : " I have said that, upon receipt of a letter, Mr. Sergeant wrote to Ruhl to see that the title was good ; I also said that Mr. Ruhl had an office with Mr. Sergeant ; and I said that Martin repeatedly saw Ruhl at Mr. Sergeant's office, and about other transactions connected with the Sepviva estate. I withdraw what I said upon those points, as there is no evidence to that effect." The withdrawal of the statements complained of was so distinct and emphatic that the jury could not fail to understand that they were thus wholly eliminated from the charge, and therefore to be treated by them as though they had never been uttered.

The seventh and eighth specifications are without merit. It was clearly competent for the defendant to prove that he never in any manner received any consideration for the mortgage in controversy. It was also competent, for the same purpose, to prove that the defendant never received the check for $2,500, drawn by the plaintiffs in favor of John Ruhl.

Neither of the several specifications of error is sustained.

Judgment affirmed.